FILED
2013 Oct-25  AM 09:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| MARSHALL BLAISE ADAMS, SR., as administrator of the estate of MARSHALL BLAISE ADAMS, JR., | ) ) ) ) | |
| Plaintiff; | ) ) | 7:12-cv-1942-LSC |
| vs. | ) ) ) | |
| DR. JAMES HOOPER, | ) ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

This case is a diversity action involving a claim of medical malpractice. Before the Court are Defendant James Hooper's motion to strike the testimony of Plaintiff's expert, Dr. George S. Glass, based on Rule 702 of the Federal Rules of Evidence ("Rule 702") and motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Docs. 58, 59.) Both issues have been fully briefed, although Plaintiff has moved to strike portions of Defendant James Hooper's reply briefs that exceed the page limits set by the Court. (Doc. 66.) Defendant James Hooper has requested that the Court either allow his briefs or allow him to file substituted briefs.

(Doc. 67.) All of these motions are now ripe for review, and for the reasons below, the motion to exclude expert testimony is due to be granted in part and denied in part, the motion for summary judgment is due to be granted, the motion to strike the reply briefs is due to be denied, and the motion to substitute reply briefs is due to be treated as moot.

## I.   Background

Marshall Blaise Adams, Jr. ("Adams"), sought treatment from Dr. James Hooper ("Hooper") of the Tuscaloosa Treatment Center ("TTC") for opiate addiction stemming from his addiction to pain killers originally prescribed to treat his back pain. Hooper, who is board certified in general psychiatry and forensic psychiatry, began treating Adams on February 1, 2011, with methadone maintenance. Methadone is a drug used to alleviate withdrawal symptoms for those addicted to opiates.

During the intake process, Adams signed various forms warning him of the dangers of combining methadone with other drugs. As part of his initial evaluation, Adams reported use of opiates, benzodiazepines (Xanax), cocaine, and marijuana. TTC's drug testing of Adams demonstrated that he was positive for opiates. Hooper then set Adams's initial dosage at 30 milligrams of methadone daily, and his target

dosage at 70 milligrams per day. He would reach this target dosage in increases of 5 to 10 milligrams per day.

Adams first received 70 milligrams per day on February 5, 2011, after increases of 10 milligrams each day. After that, the daily dosages varied based on Adams's reports to Hooper. From March 3, 2011, to April 21, 2011, Adams remained on 70 milligrams per day. Adams's dosages were decreased after he expressed a desire to pursue a different form of treatment. He was discharged from TTC on April 25, 2011.

Adams returned to TTC on August 25, 2011. He underwent the same patient intake process as his first admission to TTC. Adams was determined to be an appropriate candidate for methadone maintenance treatment on his second admission to TTC. At his second admission, he tested positive for opiates, Xanax, cocaine, and marijuana, and was again warned about the danger of using other drugs with methadone. Once again, Hooper started Adams on an initial dose of 30 milligrams of methadone per day with a target dose of 70 milligrams per day, with increases of 5 to 10 milligrams each day. He reached the dosage of 70 milligrams per day on August 29, 2011. He remained on 70 milligrams per day on August 30, 2011, and August 31, 2011. On August 31, 2011, Hooper approved an increase to 80 milligrams per day beginning on September 1, 2011. However, Adams never received this dosage. Adams was found

dead in his apartment on August 31, 2011.

An autopsy listed the cause of death as a multiple drug overdose, and an analysis by the Alabama Department of Forensic Sciences found a number of drugs in his system, including amphetamine, Benadryl, cocaine, marijuana, methadone, and Xanax. After Adams's death, his father, Marshall Blaise Adams, Sr. ("Plaintiff"), filed this action alleging medical malpractice. Hooper is the only defendant remaining before the Court.

## II.     Motion to Strike

Hooper moves to strike the testimony of Plaintiff's expert, Dr. George S. Glass ("Glass"). "'Evidence inadmissible at trial cannot be used to avoid summary judgment.'" *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) (quoting *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 661 (5th Cir. 1976)).[1] Hooper challenges the admissibility of Glass's testimony under Rule 702 and the framework of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

> an opinion or otherwise if: (a) the expert's scientific,
> technical, or other specialized knowledge will help the trier
> of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court has the obligation to screen expert evidence under Rule 702 to ascertain that it "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S. Ct. 2786, 2795 (1993). "[T]he requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590, 113 S. Ct. at 2795. *Daubert*'s requirements apply not only to scientific knowledge, but also to all forms of specialized knowledge on which experts testify. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1175 (1999). Under *Daubert*, this Court's inquiry is flexible, but "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 594-595, 113 S. Ct. at 2797.

The Eleventh Circuit has distilled Rule 702 and *Daubert* into a three-step inquiry, determining whether:

> (1) [t]he expert is qualified to testify competently regarding
> the matters he intends to address; (2) the methodology by
> which the expert reaches his conclusions is sufficiently
> reliable as determined by the sort of inquiry mandated in

> *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Tampa Bay Water v. HDR Eng'g, Inc.*, - - - F.3d - - - -, 2013 WL 5305346, at *9 (11th Cir. Sept. 23, 2013) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). As to the first prong, an expert is qualified to testify if he or she has "knowledge, skill, experience , training, or education" in the area in which he or she is testifying. *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (emphasis removed) (quoting Rule 702). Under the second prong, the Court must assess the reliability of the evidence based on the following four elements outlined in *Daubert*: (1) existence of testing or the ability to test the expert's methodology; (2) existence of peer review or publication of the methodology; (3) establishment of any known or potential rate of error; and (4) presence or absence of general acceptance in the scientific community. *See Daubert*, 509 U.S. at 593-594, 113 S. Ct. at 2796-2797, *and Frazier*, 387 F.3d at 1262. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier*, 387 F.3d at 1262. Finally, the third prong requires the Court to determine whether the testimony "concerns matters that are beyond the understanding of the average lay person." *Id.*

"Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-1263.

This Court has discretion to determine whether an expert's testimony should be excluded. *Kumho Tire Co.*, 526 U.S. at 152, 119 S. Ct. at 1176. Hooper challenges Glass's expert testimony as it relates to two issues in the case— the standard of care and the cause of Adams's death. The Court examines each in turn.

### A.      Standard of Care

Glass testified regarding the applicable standard of care in the methadone maintenance context. Based on his two expert reports, Glass's opinions on the standard of care essentially break into the following five components: (1) physicians should start methadone dosages at a low level and increase the dosages slowly; (2) physicians should discredit the complaints of patients with a history of drug abuse and failed drug screens when determining whether an increased methadone dosage is appropriate; (3) physicians should follow clinical protocols in increasing methadone dosages; (4) patients for readmission to methadone maintenance should not be treated by the physician as though they are resuming treatment at their previous dosage level; and (5) physicians should adopt procedures with their patients to make certain the

patients do not use dangerous drugs with methadone. Glass states that Hooper breached the standard of care by increasing Adams's methadone dosage too quickly, placing him at too high a level of methadone.

### i.   Qualification to Testify as an Expert

Glass is qualified to provide an expert opinion on the standard of care in methadone maintenance. Glass was trained in methadone maintenance during his residency at Yale between 1968 and 1971. In the early 1980s, he helped design and set up a methadone maintenance clinic. As part of that work, he prepared written protocols for increasing methadone dosages. In 2009, Glass gave a presentation entitled "A Forensic Approach to Death in Methadone Treatment" to the American College of Forensic Psychiatrists.

Hooper contends that, despite this background, Glass is unqualified based on his lack of recent experience in methadone maintenance. Specifically, although Glass may have performed methadone maintenance in the late 1960s, he currently only deals with methadone in other contexts such as pain management. According to Hooper, Glass only decreases or holds a dosage and does not increase it. However, "[a] lack of personal experience . . . should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702." *U.S. v. Wen*

*Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013). Here, Glass has knowledge of methadone maintenance, education in methadone maintenance, and training in methadone maintenance. He also has more recent experience prescribing methadone to patients, albeit at the same dosage or a decreased dosage. Hooper can adequately expose any deficiencies in Glass's qualifications, such as his lack of more recent experience in methadone maintenance, to the fact finder through cross examination. Thus, Glass is qualified to offer his opinion on the standard of care.

### ii.    Methodology on the Standard of Care

Glass's methodology meets the requirements of *Daubert*. Glass expressed personal familiarity with the applicable standard of care, stating: "I've read the guidelines. I'm an ASAM-certified guy like Dr. Hooper, and I'm a board certified guy. I have some understanding of what's good and bad medicine, good and bad substance abuse treatment, and good and bad psychiatry. And that's what I'm commenting about." (Doc. 58-2, Glass Depo., at 162.) Thus, Glass derived the standard of care by reviewing applicable guidelines and by relying on his experience in psychiatry and addiction medicine. Although Hooper may probe Glass's findings on cross examination to determine whether Glass arrived at an appropriate standard of care, he has used appropriate methods to determine the standard of care.

After stating the standard of care, Glass's expert reports demonstrate that he reviewed the medical records in Adams's case and compared Hooper's actions against the appropriate standard of care. Glass's supplemental expert report notes the specific breaches of the appropriate standard of care. Those reports also discuss many of Hooper's practices that are at issue in this case. Any gaps or omissions in Glass's testimony can be exposed through vigilant cross examination, and his methodology on the standard of care satisfies *Daubert*.

### iii.    Aid to the Trier of Fact

Glass's testimony aids the trier of fact in this case because the standards of care in addiction medicine and psychiatry are beyond the understanding of the average lay juror. In a medical malpractice action under Alabama law, the plaintiff is actually required to present expert testimony describing both the appropriate standard of care and the deviation from that standard of care. *Lyons v. Walker Reg'l Med. Ctr.*, 791 So. 2d 937, 942 (Ala. 2000). Thus, Plaintiff has satisfied the third prong of this analysis.

### iv.    Defects in the Expert Reports

Hooper also contends in his motion for summary judgment that Glass fails to state a standard of care in his Rule 26 expert disclosures. Any party that fails to provide necessary information under Rule 26(a) or (e) "is not allowed to use that

information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). This decision is also within the Court's discretion. *Romero v. Drummond Co.,* 552 F.3d 1303, 1323 (11th Cir. 2008).

First, the Court notes that Glass's reports do contain statements of the standard of care, even though stated in the negative. For example, he stated: "To not follow clinic protocol, and to immediately ramp up [one's] methadone dose is [b]elow the [s]tandard of [c]are." (Doc. 63-4, Glass Supp. Report, at 13.) It is clear from this statement that the applicable standard of care is to follow clinical protocols. The same can be said of his other opinions establishing standards of care.

Moreover, Glass also states the standard of care in his deposition (Doc. 58-2, Glass Depo., at 178-179), and Hooper relies on it in moving for summary judgment. Hooper knows the standard to which Glass will testify, and he can prepare for cross examination in those areas. If Glass were to testify outside those areas at trial, Hooper would be entitled to make a renewed motion to exclude, but at this point any error is harmless.

## B.    Cause of Death

Plaintiff also uses Glass to provide an expert opinion on the cause of Adams's

death. The Court must examine Glass's expert reports and deposition to determine whether such testimony meets the requirements of Rule 702.

### i.    Qualification to Testify as an Expert

Hooper contends that Glass is unqualified to state an expert opinion on the cause of death because he is not certified as a toxicologist or a pathologist. "[A]n expert may not testify to his opinion on matters outside of his field of training and experience." *Kyser v. Harrison*, 908 So. 2d 914, 919-920 (Ala. 2005) (quotations omitted). In the particularly specialized area of pediatric pathology, the Alabama Supreme Court upheld a lower court's exclusion of a licensed forensic pathologist who lacked specific training in pediatric pathology. *Id.* at 919. However, in the medical malpractice context, an expert qualified to testify on the standard of care and its breach is usually qualified to testify on causation. *See Boyles v. Dougherty*, - - - So. 3d - - - -, 2013 WL 5394326, at *3-4 (Ala. Sept. 27, 2013) (determining that the testimony of a nurse could be used in part to assess proximate cause regarding another nurse's conduct).

Glass's lack of specialization in toxicology and pathology does not automatically disqualify him from testifying on causation because he has experience with drug addictions and drug interactions. As a specialist in addiction medicine, Glass has

received additional training. He asserts that he is familiar with drugs and drug interactions, and he is familiar with how other drugs interact with methadone. Glass also prescribes methadone. Even though Glass has recently prescribed methadone in the context of either holding a dosage or lowering it, not increasing it, he undoubtedly retains a general familiarity with how methadone may interact with other substances in the body. Thus, Glass is qualified to testify as an expert on the cause of death.

### ii.   Methodology on Cause of Death

Although Glass may be qualified to offer an expert opinion on the cause of death, the Court must still examine the reasoning underlying his conclusions to determine whether he satisfies *Daubert*. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (warning district courts not to conflate the three concepts). Glass's testimony on the cause of death is due to be excluded because it does not satisfy *Daubert*.

Glass concluded in his expert report that "Marshall B. Adams, Jr., died as a result of his Methadone dosage being too rapidly increased so that he did not have the time to develop physiological tolerance to the drug." (Doc. 63-4, Glass Report, at 9.) Similarly, in his deposition, Glass stated: "I know that it takes a period of time to develop tolerance to a narcotic, particularly methadone or any other. [Adams] had not

had sufficient time to develop that." (Doc. 58-2, Glass Depo., at 123.)

The underlying methodology fails to buttress this conclusion. First, Glass admits that he did not know Adams's tolerance level. (Doc. 58-2, Glass Depo., at 110.) However, Plaintiff contends that even though Glass did not know Adams's tolerance level, "[t]his is a variable that cannot be reasonably calculated by anyone based on the information given." (Doc. 63 at 9.) The record suggests that methadone tolerance is at least difficult, if not impossible, to calculate in this case. Dr. Jack Kalin ("Kalin"), an expert offered by Hooper, also could not state a specific tolerance:

> [M]y understanding is that [Adams] is a consumer of drugs, and he is, obviously, going to be somewhat tolerant. The degree, I can't tell you, but he's obviously tolerant sufficiently to be able to withstand, up until the very last day, certainly, methadone and some of these other substances, because we know that they were ingested within the prior twenty-four hours. So he does have a degree of tolerance. Specifically to what and to what degree, I can't say.

(Doc. 60-5, Kalin Depo., at 122-123.) Regardless, just because a theory is untestable does not necessarily make it unreliable, but it does require the Court to be more searching in its analysis of reliability. *Sumner v. Biomet, Inc.*, 434 F. App'x. 834, 842 n. 8 (11th Cir. 2011).

Glass stated that Adams's tolerance should have been similar to Adams's

tolerance during his previous treatment at TTC. There, he opined that it took Adams four weeks to develop a tolerance at 70 milligrams per day. (Doc. 58-2, Glass Depo., at 109-110.) He also based his opinion on Adams's experience with Suboxone, another drug, noting: "[I]f the assumption is that he had just come off Suboxone in August, as he had just come off Suboxone in—as he said he had in February, it should take approximately the same length of time." (Doc. 58-2, Glass Depo., at 110.)

The methodology Glass used to establish this approximation is unreliable. As to the assumption about Suboxone, Glass notes: "We don't know whether [Adams] was really taking Suboxone in August because he wasn't seen by Dr. Hooper for several months."[2] (Doc. 58-2, Glass Depo., at 110.) Glass also stated that he did not know the amount of drugs in Adams's system when he was readmitted in August 2011, and that this would impact methadone tolerance. (Doc. 58-2, Glass Depo., at 111.)

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512,

---

[2] Hooper admits that Adams received Suboxone from him during the summer of 2011. (Doc. 60 at 8.) However, Hooper also noted at his deposition that after approving a new prescription on or around July 11, 2011, he did not communicate with Adams again until August 25, 2011. (Doc. 60-3, Hooper Depo., at 93-95.) This was a substantial period of time where neither Hooper nor Glass knew whether Adams was actually taking the Suboxone as directed.

519 (1997).[3] Instead, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Here, the existing data present a series of unknowns. Glass did not know Adams's tolerance for methadone, and he lacked knowledge of key data to establish a baseline for Adams's tolerance in August 2011, namely whether Adams was on Suboxone in August 2011 and the levels of other drugs Adams had taken in August 2011. Based on the gaps in this methodology, the Court cannot find that the methodology underlying the cause of death in the expert report is reliable under *Daubert*.

Also undermining Glass's methodology on tolerance is that he actually makes a different statement of the cause of death in his deposition. He acknowledged that he was not contradicting the autopsy report's cause of death—multiple drug overdose. Glass stated in his deposition that the amount of methadone in Adams's system caused an overdose when mixed with the other drugs. Glass opined: "What ultimately caused [Adams's] death was an overdose of methadone, Xanax primarily, perhaps a certain amount of cocaine and ephedrine, but primarily methadone and Xanax. We don't know the weighting of the other drugs." (Doc. 58-2, Glass Depo., at 195-196.)

---

[3] The term "*ipse dixit*" refers to "[s]omething asserted but not proved." Black's Law Dictionary (8th ed.) 847. Thus, the Court cannot rely merely on an expert's assertions to establish that the testimony satisfies *Daubert*.

Glass also stated that "the odds are that if [Adams] had been kept at 30 [milligrams of methadone per day], using what he did, in all medical probability, he probably would not have died." (Doc. 58-2, Glass Depo., at 142.) Thus, Glass concludes that the increase in methadone caused a toxic mixture with other drugs, most notably Xanax, and this caused Adams's death.

This conclusion is not supported by reliable reasoning that satisfies *Daubert*. Glass relies on the fact that Adams was given 30 milligrams of methadone on the first day of treatment when the same drugs were in his system, and he did not die. Glass stated: "If he took them at the same levels that showed up in the drug screen, except for the methadone level, in most reasonable likelihood, he would not have died, because he was taking a relatively similar amount, I suspect." (Doc. 58-2, Glass Depo., at 143.) However, Glass also acknowledged that he did not know the amounts of the drugs in Adams's system at the first drug screen and conceded that they could be lower than the amounts on August 31, 2011. (*Id.*) Essentially, Glass relied on the fact that one variable increased in order to predict an ultimate outcome—death. However, he did not know whether other variables also changed in order to affect that outcome. Merely showing a correlation between an increase in methadone dosages and death does not lead to a reliable conclusion that the methadone increase caused

Adams's death, without more.

Additionally, when Glass considered various drug interactions, he concluded that another combination not involving methadone might have caused the death. Again contending that Adams would still be alive had he been given 30 milligrams of methadone per day, he stated:

> [B]enzodiazepines, in and of themselves, do not cause people to have respiratory depression and arrest. Benzodiazepines with marijuana don't cause that, in general. We don't know what the cocaine level was, in addition. Cocaine and benzo might have, but clearly, that was not one of the ones that was labeled as an issue. And that was not a–
> Q. He did. It was marked as positive.
> A. It was marked, but it was not a medication that was prescribed but he'd been taking it.
> Q. Right. Well, he hadn't been prescribed Xanax, had he?
> A. No.

(Doc. 58-2, Glass Depo., at 124-125.) Glass acknowledged that cocaine and benzodiazepines, two drugs besides methadone, could have potentially caused Adams's death. He also acknowledged regarding his discussion with the state pathologist who prepared a report: "I did not go piecemeal apart what about the cocaine, what about the other medications. It was just the combination is what she thought killed him, which is what Dr. Boudreaux said in his autopsy, which I don't question." (Doc. 58-2, Glass Depo., at 32.)

Thus, although Glass has opined that methadone and Xanax can have a toxic mix that may cause death, his underlying methodology does not support the conclusion that this happened here. Instead, he acknowledged the existence of one alternative and also acknowledged that he did not work through all of the drugs in Adams's system for possible adverse interactions. There is also no indication from the record that Glass considered the potential impact of Adams taking different drugs at different times and whether this might have caused the drug reaction that resulted in his death.

Finally, Glass opined about the lack of accountability in the system. He stated:

> [Adams] could have taken [the other drugs] that afternoon before he died. He could have taken them the whole week before he died. Considering that Mr. Adams was a drug addict and was aware that there were no consequences to him, other than having to pay $15 for an extra urine test and being scolded by a counselor, he could have very likely taken them every single day between when he started on August the 25th until he died.

(Doc. 58-2, Glass Depo., at 186.) The Court reads this to suggest that Hooper's lack of accountability caused Adams's death by making it more likely that he would continue consuming other illegal substances along with methadone. Glass emphasized the lack of accountability procedures when discussing the applicable standard of care in this case.

However, there are several flaws in Glass's methodology. Glass acknowledged that he did not know Adams's daily drug usage, stating that "[w]e have no idea what he did every single day, other than go to the methadone clinic." (Doc. 58-2, Glass Depo., at 116.) He also stated that "people with a pattern of abusing drugs, as Mr. Adams was, while in treatment continue to use them." (Doc. 58-2, Glass Depo., at 117.) Glass fails to provide sufficient testing, data, and principles to suggest that Adams, at this early stage of his treatment, would have decreased his drug usage with proper accountability procedures to penalize him for using prohibited drugs. Instead, he appears to state the contrary—individuals at this stage of treatment continue to use drugs.

Given the flaws in Glass's methodology, his testimony on the cause of death fails *Daubert*, and thus the evidence is inadmissible under the second prong of the analysis.

### iii.    Aid to the Trier of Fact

Although the issue of cause of death is beyond the understanding of the average lay juror, Glass's testimony on Adams's cause of death will not aid the trier of fact in this case because the underlying methodology is flawed. Since Glass's methodology is not sufficiently reliable under *Daubert*, Plaintiff cannot satisfy the third prong of the

analysis.

Thus, the expert testimony is due to be excluded on the issue of cause of death.

## III.   Motion for Summary Judgment

After the exclusion of Glass's expert testimony on Adams's cause of death, the motion for summary judgment is due to be granted.

### A.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); *see also Avenue CLO Fund, Ltd. v. Bank of America, NA*, - - - F.3d - - - -, 2013 WL 3853175 at *3 (11th Cir. 2013). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues that should be resolved at trial.  *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may

yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Services, LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

## B.    Discussion

Medical malpractice actions under Alabama law are governed by the Alabama Medical Liability Act ("AMLA"). AMLA states that "the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." Ala. Code § 6-5-548(a). Ultimately, the plaintiff must show: "1) the appropriate standard of care, 2) the [health care provider's] deviation from that standard, and 3) a proximate causal connection between the [health-care provider's]

act or omission constituting the breach and the injury sustained by the plaintiff."
*Mosley v. Brookwood Health Servs., Inc.*, 24 So. 3d 430, 433 (Ala. 2009) (alterations in
original) (internal quotations omitted).

The plaintiff in a medical malpractice action under Alabama law must generally
produce expert testimony both to establish the appropriate standard of care and breach
of the standard of care. *Morgan v. Publix Super Markets, Inc.*, - - - So. 3d - - - -, 2013
WL 4294149, at *4 (Ala. August 16, 2013) (quoting *Anderson v. Alabama Reference
Labs.*, 778 So. 2d 806, 811 (Ala. 2000)). Plaintiff produced Glass's testimony, and for
the reasons discussed above, the Court has allowed his testimony both to set a
standard of care and to establish breach of the standard of care. Furthermore, the
Court addressed in Part II(A)(iv), *supra*, Hooper's argument raised on summary
judgment regarding defects in the expert reports. The issue, however, is the proximate
cause of the injury.

In order to show proximate cause in a medical malpractice action under
Alabama law, "the plaintiff must demonstrate that the alleged negligence probably
caused, rather than only possibly caused, the plaintiff's injury." *Miller v. Bailey*, 60 So.
3d 857, 862-863 (Ala. 2010) (internal quotations omitted). "A plaintiff in a medical-
malpractice action must also present expert testimony establishing a causal connection

between the defendant's act or omission constituting the alleged breach and the injury suffered by the plaintiff." *Cobb v. Fisher*, 20 So. 3d 1253, 1257 (Ala. 2009) (internal quotations omitted). A plaintiff may survive without expert testimony if "a layperson can reliably determine the issue of causation." *DCH Healthcare Auth. v. Duckworth*, 883 So. 2d 1214, 1217 (Ala. 2003) (internal quotations omitted).

With Glass's testimony on the cause of death excluded, Plaintiff cannot produce substantial evidence of proximate cause. Plaintiff points to several indicators of potential causation in the depositions of Karen Valencia ("Valencia"), a forensic scientist who prepared Adams's toxicology report, and Stephen Boudreau ("Boudreau"), the pathologist who performed the autopsy and determined the cause of death. However, these are insufficient to produce substantial evidence of proximate cause.

Valencia tested Adams's subclavian blood for evidence of drugs. She acknowledged that methadone levels would be elevated due to "postmortem redistribution." (Doc. 60-15, Valencia Depo., at 17-19.) She discussed the amount of methadone in Adams's system in the test:

> Q. And the Methadone, could that have been fatal by itself?
> A. That number is very high, and if that was in a peripheral sample, sure. Given that I am not exactly sure if that [amount of methadone] is really what was happening at the

> time of death, maybe, maybe not.
> Q. What about that sample of Methadone in combination
> with any of the other drugs, would it have been fatal?
> A. It could have been.

(Doc. 60-15, Valencia Depo., at 43-44.) This statement fails to provide substantial

evidence of proximate cause for several reasons. First, the equivocal statements here

are not sufficient to suggest that methadone, either by itself or in combination with

other drugs, *probably* caused Adams's death. *See White v. Jones*, 717 So. 2d 413, 415

(noting that a doctor's discussion of several possible causes of an injury was not

testimony as to proximate cause). Second, Valencia acknowledged that in her work she

does not determine a cause of death—that decision is made by the medical examiner.

Thus, it is not reasonable to infer that Valencia was attempting to state a cause of

death at her deposition.

The Court must also examine Boudreau's analysis as the medical examiner.

Boudreau stated in his affidavit: "I did not determine that methadone was the cause

of Marshall Adams's death. It was not possible to determine whether Marshall

Adams's death would have occurred in the absence of methadone, or any one of the

many other drugs, found present in his system on the toxicology report." (Doc. 60-16,

Boudreau Affidavit, at 12.) However, at his deposition, Boudreau stated that

methadone "was additive to all of the other drugs that he had" in causing his death.

(Doc. 60-16, Boudreau Depo., at 37.) Plaintiff also points to language from Valencia in her deposition where she stated that methadone, Xanax, and potentially Benadryl could combine to cause or enhance central nervous system depression and death. (Doc. 60-15, Valencia Depo., at 31-33.)

These statements fail to establish substantial evidence of proximate cause in this case. Proximate cause is ultimately a bridge from the breach to the injury. Here, the breach is not actually that Adams had methadone in his system. It is undisputed that it was reasonable to prescribe Adams methadone, and even Glass assumed that Adams would have 30 milligrams of methadone in his system. The opinions of Valencia and Boudreau establish, at most, that methadone in *some* amount would contribute to Adams's death. They offer no opinion that the *increase* in methadone dosages caused a multiple drug overdose that would not have resulted from a smaller dosage of methadone, which is what Plaintiff alleges is the breach in this case.

Finally, Plaintiff also points to excerpts from Kalin, an expert offered by Hooper, as evidence that methadone caused the overdose. Specifically, he points to the following exchange as evidence of causation:

> Q. And specifically, if you would, I know you've said it a minute ago, and I'm sorry for being redundant, which of those drugs would cause central nervous system depression and respiratory failure?

> A. The primary depressants are the methadone and the
> Alpraxolam. The secondary depressant would be the
> Diphenhydramine [Benadryl]. But once you get down to a
> low level of respiration, you have the unknown effect of the
> Amphetamine and the cocaine with the heart. So it's—I
> hate to— you say redundant. I say redundant, multiple drug
> overdose.
> Q. And you categorized the first two as methadone and
> Xanax, and you say the Benadryl is secondary. Why do you
> list it as secondary?
> A. Well, it's not as strong a depressant as the other two
> drugs. But it is pushing this house of cards in the same
> direction.

(Doc. 60-5, Kalin Depo., at 110.) Although Kalin identifies methadone as a "primary

depressant," this statement alone is far too ambiguous to lead to a reasonable

inference that methadone was the proximate cause of Adams's death. Instead, this

exchange, read in context, suggests that all of the drugs working together led to the

death. Critically, Kalin's statements do not discuss at all the particular breach alleged

in this case, which is the increase in methadone dosage. This statement does not

provide any reasonable link from which the fact finder could infer that the increased

methadone dosage, the rate of increase, or both, caused the toxic combination.

Moreover, this does not undermine or create room for a reasonable dispute as to

Kalin's conclusion that "[o]ne cannot parse out individual toxicities of individual

substances in combination nor can one state with any degree of medical certainty or

probability that methadone or any other individual substance for that matter was the cause of death." (Doc. 60-5, Kalin Report, at 46.)

There is no evidence in the record that any of the medical experts offering testimony in this case either knew or could determine the amount of drugs Adams was taking in the days before his second admission to TTC and during his second admission to TTC. This information would be critical for establishing a baseline for Adams's methadone tolerance so that the fact finder could determine that the dosage of methadone or the rapid increase in dosage probably caused Adams's death. Only Glass offered Plaintiff a possible causal link, and his testimony has been excluded for the reasons discussed at length in Part II(B), *supra*. Without Glass's testimony, there is no substantial evidence that the increased amount of methadone was the proximate cause of Adams's death. In his response to the motion to strike, Plaintiff contends that Glass's opinions were only meant to supplement the opinions provided by the Alabama Department of Forensics. The record does not bear out this reading of Glass's testimony. Glass contradicted the testimony of the other expert analysts in this case, and without that testimony, Plaintiff cannot show proximate cause. Summary judgment is thus due to be granted.[4]

---

[4] The Court notes that Hooper also moved for summary judgment on his affirmative defenses of assumption of risk and contributory negligence. Since the Court has determined that Hooper is

**IV.     Motions on the Length of Hooper's Reply Briefs**

Finally, the motion to strike the excess pages in Hooper's reply briefs is due to be denied. The content of the reply briefs do not influence the Court's rulings in this case. Instead, the Court has evaluated the entirety of the record based on the motions and submissions of the parties. It has reviewed their citations to the record and has also independently reviewed the depositions and affidavits at issue in this case. The Court views the excess pages as a minor error that does not prejudice either party.

**V.     Conclusion**

For the reasons discussed above, Hooper's motion to strike Glass' expert testimony (Doc. 58) is due to be granted in part and denied in part. Hooper's motion for summary judgment (Doc. 59) is due to be granted. Plaintiff's motion to strike portions of Hooper's reply brief (Doc. 66) is due to be denied, and Hooper's motion to file a new, shorter brief (Doc. 67) is due to be treated as moot. A separate order will be entered.

Done this <u>25th</u> day of <u>October 2013</u>.

---

entitled to summary judgment based on proximate cause, it need not consider whether he is entitled to summary judgment based on the affirmative defenses.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

174256